RYAN, Circuit Judge.
Plaintiff Queen City Home Health Care Company appeals the district court’s grant of summary judgment for the Secretary of Health and Human Services in Queen City’s action challenging the Secretary’s decision affirming a reasonable charge determination for seat lift chairs furnished to Medicare beneficiaries. The reasonable charge determination, known as the inherently reasonable allowance (IRA), was initially made by the Secretary’s designee Nationwide Mutual Insurance Company, a private insurance carrier.
Queen City raises five issues on appeal:
1. Whether Nationwide’s failure to seek notice and comment before promulgating the 1987 IRA prevent Nationwide from applying the IRA;
2. Whether Nationwide’s method of determining the 1987 IRA violated regulations, thus preventing Nationwide from applying the IRA;
3. Whether the AU erred by considering evidence generated by Nationwide after Nationwide decided to use an IRA for 1987 and determined the amount of that IRA;
4. Whether the AU’s conclusion that the standard fee screens produced an unreasonable charge was supported by substantial evidence; and
5. Whether the AU’s conclusion that the 1987 IRA amount may properly be based on the Sears catalog price was supported by substantial evidence?
After carefully examining the record, we are satisfied that the AU’s conclusions are supported by substantial evidence. There *238 fore, we affirm the judgment of the district court.
I.
A.
This dispute arises from the Secretary’s determination of the reasonable charge limit applied to the cost of seat lift chairs supplied by Queen City to Medicare Part B beneficiaries. The federal government reimburses Queen City for most of the cost of the chairs supplied to Part B beneficiaries.
The Medicare program consists of two parts. Part A, 42 U.S.C. §§ 1395-1395Í, covers hospitalization and extended care services. Part B, 42 U.S.C. §§ 1395j-1395w-4, reimburses beneficiaries for 80% of the cost of certain medical and health services and equipment. One class of items Part B covers is durable medical equipment (DME). Seat lift chairs are classified as DMEs. Part B “resembles a private medical insurance program that is subsidized in major part by the Federal Government.” Schweiker v. McClure, 456 U.S. 188,190 (1982). Private insurance carriers administer Part B under contract with the Health Care Financing Administration (HCFA) of the Department of Health and Human Services. 42 U.S.C. § 1395u(a).
The entity supplying the Part B item or service may accept an assignment of the beneficiary’s Part B claim, allowing the beneficiary to obtain the desired item without a substantial cash payment. By accepting the assignment, the supplier agrees to accept the “reasonable charge,” an amount determined by the carrier, in full payment for the item. The supplier is then partially reimbursed for the amount by Medicare, and the remainder is paid to the supplier by the beneficiary or his coinsurer. 42 U.S.C. § 1395u(b)(3)(B)(ii).
One of the key features of the Part B insurance carrier program is the determination of the “reasonable charge” for a supplied item or service. The relevant statute gives the Secretary the authority to delegate the reasonable charge determination to a private insurance carrier. 42 U.S.C. § 1395u(a)(l)(A).
After a Medicare supplier provides the beneficiary with the service or item, the supplier submits the charge to the carrier. Before it pays the charge, the carrier must first determine whether the submitted charge is a reasonable charge. The carrier makes this determination by comparing the submitted charge to the charges produced by using what are called “standard fee screens.” The standard fee screens are five methods that carriers may employ to analyze charge data, and the screens are fully described in the relevant regulations, 42 C.F.R. §§ 405.503, 504, 508, 509, 511(c) (1991). After a carrier determines an amount from each of the applicable standard fee screens, it chooses the lowest, which becomes the reasonable charge — unless the carrier believes that such charge is not “inherently reasonable.” If the carrier determines that the amount is not inherently reasonable, the carrier may then set an IRA. Thus, the carrier undertakes two evaluations: 1) Is the charge from the applicable standard fee screens inherently reasonable; and 2) If not, what is the appropriate IRA?
In 1986, Congress amended the Medicare Act twice, and both amendments apply to this case. The first amendment, in April, changed the provisions concerning the determination of inherent reasonableness. Prior to April 1986, 42 U.S.C. § 1395u did not explicitly discuss the determination of inherent reasonableness, and the only relevant language was the requirement that charges be reasonable.
Effective April 7, 1986, Congress added a new paragraph to section 1395u. It now reads:
The Secretary by regulation shall—
(i) describe the factors to be used in determining the cases (of particular items or services) in which the application of this subsection results in the determination of a reasonable charge that, by reason of its grossly excessive or grossly deficient amount, is not inherently reasonable, and
*239 (ii) provide in those cases for the factors that will be considered in establishing a reasonable charge that is realistic and equitable.
42 U.S.C. § 1395u(b)(8)(A) (1988). This statutory change had a domino effect on regulations and interpretive rules. In August 1986, the Secretary revised 42 C.F.R. § 405.502 to reflect the amended 42 U.S.C. § 1395u. The Secretary added language to section 405.502(a) and added a new paragraph, section 405.502(g). The new regulations detailed the circumstances in which the HCFA or a carrier may apply an IRA, and they became effective September 10, 1986.[1]
In March 1987, the HCFA revised section 5246 of the Medicare Part B Carriers’ Manual to more closely reflect the new regulations. The HCFA issues the Carrier’s Manual, pursuant to the Secretary’s interpretive rulemaking authority, to explain and clarify regulations. 5 U.S.C. § 553, 42 U.S.C. §§ 1302, 1395hh. The HCFA revised the Carriers’ Manual in two ways. First, it revised the text describing the factors that carriers should use to determine an IRA amount, omitting explicit references to two factors listed in the existing version of the Part B Carriers’ Manual: suggested retail prices and catalog prices. However, the revised manual added language allowing use of “[o]ther relevant factors.”- Carriers’ Manual, § 5246 (Rev. 1180, March 1987. Second, the HCFA required carriers to review existing IRAs. Carriers’ Manual, § 5246 n. *.
Congress’ second 1986 amendment to the Medicare Act related to the jurisdiction of federal courts. The amendment provided that effective January 1, 1987, 42 U.S.C. § 1395ff permits judicial review of benefit determinations under Parts A and B of Medicare in the same manner that courts review Social Security decisions. This court possesses jurisdiction in the present case under the new section.
B.
Queen City is a supplier of seat lift chairs designed for arthritic or disabled persons who need assistance rising to a standing position. Beginning in 1984, Queen City began to solicit orders through television advertising targeted at Medicare Part B beneficiaries. To pay for the chair, beneficiaries assign their Part B claims to Queen City, and Queen City submits the assigned claims to the proper Part B insurance carrier. Since Queen City is based in Cincinnati, Ohio, the point of sale was Cincinnati, and it submitted all of its claims to Nationwide Mutual Insurance Company, the Part B carrier for Ohio and West Virginia.
As a result of its television campaign, Queen City sold a much greater number of chairs in 1984-85 than in 1983-84. From April 1984 to March 1985, Queen City sold approximately 20 times the number of chairs sold from April 1983 to March 1984. Charges for the chairs also escalated, from $1,695 to $2,400. This led Nationwide to determine that the standard fee screens resulted in a charge that was not inherently reasonable, so Nationwide decided to apply an IRA to seat lift chairs for the 1986 fee screen year.
An industry group, the' Association of Seat Lift Manufacturers (ASLM), contested *240 the IRA in federal court. The district court decided that it lacked jurisdiction, and this court affirmed. Association of Seat Lift Mfrs. v. Bowen, 858 F.2d 308 (6th Cir.1988), cert. denied, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989) (ASLM). This court specifically noted that the 1986 amendment to 42 U.S.C. § 1395ff, providing for judicial review of charge determinations, did not apply to the challenge to the 1986 IRA. The court held:
The 1986 legislation, which provides for judicial review (subject to amount in controversy requirements and several other restrictions) only with respect to services and items furnished on or after January 1, 1987, supports this interpretation of prior law. The 1986 legislation specifically precluded judicial review of Nationwide’s reasonable charge determination for seat lift chairs fixed prior to January 1, 1987, while it authorized judicial review of those charges which were established after that date.
ASLM, 858 F.2d at 316.
Despite holding that it lacked jurisdiction to consider the merits of the appeal, this court did discuss, at length, the seat lift chair issue. It observed that in determining the reasonable charge for fee screen year 1986, Nationwide first analyzed the standard fee screens and the lowest amount, $2,400 per chair. This court held:
Because Queen City Home Health Care dominated three-fourths of the pertinent seat lift market, Queen City effectively determined the prevailing charge and the customary charge — both of which had increased dramatically over the previous year. The Carrier concluded that the increase failed to reflect the influence of a competitive market.
Id. at 312. The court then considered Nationwide’s analysis, and held: •
Having considered the entire formidable compendium of statistical and comparative information collected during its comprehensive survey including: the pattern of Medicare claims and charges; the sudden risé in Medicare prevailing charges to excessive amounts; the noncompetitive nature of the Ohio Medicare market; Medicare charges in other states; manufacturers’ suggested retail prices; wholesale costs; and the charges of national retail suppliers operating in a competitive, non-captive Medicare market, Nationwide was satisfied that the Sears basic seat lift chair satisfied a beneficiary’s medical needs, was generally available to the beneficiary population, and at $869.51 was the least expensive alternative. It therefore concluded that $869.51 was an “inherently reasonable” charge.
Id. at 313-14. The key elements of the determination of the reasonable charge for fee screen year 1986 were 1) an IRA was justified because of a noncompetitive market, and 2) the Sears catalog was an appropriate basis for the IRA. This court’s decision in ASLM concluded the dispute as to the 1986 price.
Beginning in mid-1986,' Nationwide began to formulate the reasonable charge for 1987. The precise origins of the reasonable charge determination for fee screen year 1987 are somewhat murky. At the hearing before the AU, James Cuppy, Nationwide’s manager for audit and analysis, represented Nationwide. Cuppy was unable to recall specifically when the reasonable charge for 1987 was set. Nevertheless, the review process relies on data from the relevant base year, which for the 1987 fee screen was July 1985 to June 1986. Therefore, the reasonable charge determination process must have begun sometime after June 1986.
The record demonstrates that Nationwide determined that the lowest charge produced by the standard fee screens was $1,795. Nationwide apparently concluded that this was not reasonable, so it decided to apply an IRA. It then decided to use the same source it used to reach the 1986 IRA — the Sears catalog. Cuppy testified that the decision to úse an IRA was made in December 1986. Nationwide , announced the final determination of the 1987 IRA in a letter dated December 31, 1986. The letter stated: “Effective January 1, 1987, the I.R.A. for Seat Lifts is based on the *241 current Sears Roebuck Catalog ... Total IRA $891.95.”[2]
Subsequently, in March 1987, the HCFA revised section 5246 of the Carriers’ Manual, as noted above, to require carriers to review existing IRAs. As directed by and in compliance with the revised section, in May 1987, Cuppy prepared a written review of Nationwide’s decision to use an IRA and its determination of that IRA for fee screen year 1987. The memorandum found that one factor in determining in determining that the charges were not inherently reasonable — a noncompetitive market — did exist:
For FSY’87, 2 suppliers with a total of 1,822 frequencies established the array of actual charges for locality 002 (Cincinnati). Of those 1,822 frequencies, 1,818 or 99.78% belong to Queen City. Also, at the Carrierwide No Speciality level of prevailing [charges], there were 16 suppliers with a total of 1,937 frequencies. Of these 1,937 frequencies, again, 1,818 belong to Queen City. 94% of all seat lifts in our jurisdiction are submitted by Queen City.
The memorandum concluded: “Circumstances resulting in the initial application of IRA to seat lifts in August, 1985 have not changed. The marketplace for seat lifts in our jurisdiction is still dominated by one supplier, Queen City. Therefore, duplication of IRA to seat lifts will continue.”
The memorandum then reviewed the previously determined 1987 IRA amount of $891.95. The review consisted of canvassing manufacturers and retailers of chairs to determine dealer cost and suggested or actual retail costs, and obtaining IRA amounts from carriers in other jurisdictions. The report concluded that Nationwide should continue to apply the IRA of $891.95.
C.
Queen City appealed the IRA determination to an Administrative Law Judge (ALJ). After hearings in June 1988 and November 1988, the AU affirmed Nationwide’s IRA determination. The Appeals Council denied Queen City’s request to review the ALJ’s decision and, in January 1990, the AU’s decision became the final decision of the Secretary.
In March 1990, Queen City filed suit in the district court seeking reversal of the Secretary’s decision. After motions for summary judgment from both Queen City and the Secretary, the district court granted summary judgment to the Secretary in March 1991. Queen City appeals.
H.
A.
The standard of review this court must apply depends upon our characterization of the IRA determination under Medicare .Part B. There are two possible ways to characterize an IRA determination; it is either a regulation or a reimbursement decision. ■
One argument for the view that the seat lift IRA in this case is a regulation is that it affected thousands of separate reimbursement ' decisions. This broad impact arises from two factors: 1) Queen City’s decision to accept assignments from thousands of separate Part B beneficiaries; and 2) the agreement of parties to consolidate all the separate reimbursement appeals into one case.
No decision has yet considered how federal courts should characterize an. IRA determination. A review of the statutory scheme, however, convinces us that an IRA determination should be characterized as a reimbursement decision, not a regulation.
The formulation of reimbursement decisions under Part B is governed by 42 U.S.C. § 1395ff, which provides, in relevant part:
*242 (a) Entitlement to and amount of benefits
... [T]he determination of the amount of benefits under part A or part B of this subchapter ... shall be made by the Secretary in accordance with regulations prescribed by him.
The Secretary has delegated the function of determining reasonable charges to the carrier:
... Medicare pays no more for Part B medical and other health services than the “reasonable charge” for such service. The reasonable charge is determined by the carriers____
42 C.F.R. § 405.501(a) (1991).
Two other sections of the Medicare Act are also instructive. First, the Act describes a regulation in the following terms:
No rule, requirement, or other statement of policy ... that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).
42 U.S.C. § 1395hh(a)(2). The key phrase here is “substantive legal standard.” An IRA determination by a carrier is not a substantive legal standard because the essential characteristics of an IRA determination make it unlike a regulation. An IRA determination is not a permanent decision; rather, it is updated at least annually. In fact, the HCFA regulations require insurance carriers to review their IRAs more often if necessary. Carriers’ Manual, § 5246. Moreover, the IRA determination in this case does not apply across the country; rather, it only applies to suppliers in the Ohio/West Virginia region.
Second, the Act specifically notes that regulations must be formulated by the Secretary: ' “When used in this subchapter, the term ‘regulations’ means, unless the context otherwise requires, regulations prescribed by the Secretary.” 42 U.S.C. § 1395hh(a)(l). In this case, the IRA determination was not initially made by the Secretary, but rather by the carrier.
Finally, we note that no statute or regulation clearly states that Part B IRA determinations made by carriers should be treated as regulations. Lacking such direction, and given the entire statutory scheme, we think IRA determinations should not be treated as regulations. Rather, we shall treat them as reimbursement decisions.
This characterization has significant consequences. It means, initially, that an IRA determination is not subject to the same rule making requirements to which regulations are subject, such as notice and comment.
More importantly, treating the IRA determination as a reimbursement decision resolves the standard of review question, because the Medicare Act specifically mandates a standard of review for reimbursement decisions. The statute provides, in relevant part:
(a) Entitlement to and amount of benefits
... [T]he determination of the amount of benefits under part A or part B of this subchapter ... shall be made by the Secretary in accordance with regulations prescribed by him.
(b) Appeal by individuals ...
(1) Any individual dissatisfied with any determination, under subsection (a) of this section as to—
(C) the amount of benefits under part A or part B of this subchap-ter____
shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial review of the Secretary’s final decision after such hearing as is provided in section 405(g) of this title____
42 U.S.C. § 1395ff. The referenced section, 42 U.S.C. § 405(g), establishes judicial review of decisions by the Secretary in social security benefit cases. It provides, in relevant part: “The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive____” *243 Under section 405(g), this circuit has followed the substantial evidence standard of review:
Judicial review of the Secretary’s decision is limited to determining whether the Secretary’s findings are supported by substantial evidence and whether the Secretary employed the proper legal standards in reaching her conclusion. Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.
Brainard v. Secretary of Health & Human Services, 889 F.2d 679, 681 (6th Cir. 1989) (citation omitted). Thus, the standard of review for Part B reimbursement decisions is the same as the standard of review for social security benefit cases.
Queen City argues that the Aid’s determinations should not receive the deference mandated in the substantial evidence standard, contending: “Whether or not it is legally permissible for any AU, rather than the carrier, to be considered the agency decisionmaker on allowable determinations, the question is not at issue in this appeal because the AU explicitly refused to exercise that role." We are not persuaded. The AU, by statute, makes the final decision for the Secretary, absent a review by the Appeals Council. The AU did not have the authority to refuse to exercise the role as the final decisionmaker.
In sum, this court reviews the AU’s finding on two bases: 1) whether the AU determined the IRA according to the Secretary’s regulations, as required by 42 U.S.C. § 1395ff(a); and 2) whether there is substantial evidence to support the AU’s decision, as required by 42 U.S.C. § 1395ff(b), incorporating section 405(g).
A related question is what evidence this court may consider when reviewing the AU’s decision. This question arises because Nationwide considered certain data in making its initial IRA determination in 1986. The AU reviewed Nationwide’s decision based on the data before the carrier. The AU also received additional evidence on the same questions, evidence not considered by Nationwide in 1986. However, the. AU apparently did not rely on all of this additional evidence when making his decisions.
We must decide, therefore, whether the evidence in the record, apparently not relied upon by the AU, may be. considered by this court when reviewing the AU’s decision. This circuit has held that reviewing courts may consider the record as a whole, even if not discussed by the agency deci-sionmaker:
It is well established that judicial review of the Secretary’s findings must be based upon the record taken as. a whole. Thus, it is clear that both this court and the district court may look to any evidence in the record regardless of whether it has been cited by the Appeals Council.
Walker v. Secretary of Health & Human Services, 884 F.2d 241, 245 (6th Cir.1989) (citations omitted). We find that this rule should apply to Part B reviews, and that we must consider all the evidence in the record, even that not relied upon by the AU.
B.
Queen City assigns error to the district court’s decisions on two issues relating to the procedure by which Nationwide decided to apply an IRA for the 1987 fee screen. Specifically, Queen City contends that Nationwide failed to comply with regulations requiring 1) that Nationwide provide public notice and opportunity for comment on the proposed IRA determination, and 2) that Nationwide document its analysis of the IRA determination prior to making the IRA decision.
The precise requirements binding Nationwide from September 1986 to May 1987 are difficult to discern because the relevant statute, regulations, and Carriers’ Manual provisions all changed during the course of determining the 1987 IRA. Nevertheless, Nationwide appears to have failed to meet at least the requirement of notice and comment. The regulations then in effect stated that after September 10, 1986, a carrier proposing to implement an *244 IRA must inform affected suppliers and solicit comments. 42 C.F.R. § 405.502(g)(4) (1986).
This court, however, need not consider Queen City’s challenges to the procedure used by Nationwide, Our only concern is to review the AU decision to ensure that it is supported by substantial evidence. Therefore, even if Nationwide failed to comply with the Secretary’s regulations and the Carrier’s Manual, this failure is not a reason to reverse the AU’s decision. The IRA determination, as discussed above, is not a regulation. Nationwide’s failure to comply with the Secretary’s regulations does not mean that the determination is invalid. This court reviews the AU’s decision, not the carrier’s decision-making procedure.
The district court did not err in concluding the 1987 IRA effective despite Nationwide’s failure- to provide for notice and comment and to document its decision before applying the 1987 IRA.
C.
Queen City claims the district court erred in relying upon the analysis performed by Nationwide in May 1987 when the court reviewed the AU’s decision. Queen City argues that the May 1987 memorandum “should not have been admitted into evidence nor considered by the District court on review because it is nothing more than a ‘post hoc rationalization’ for a decision which was in fact made much earlier.” This may be factually true, but it is irrelevant. The decision under review is the AU’s decision, and no statute or published regulation precludes an AU from considering evidence and data generated by an insurance carrier after the carrier has made a decision. Queen City’s case citations support the proposition that an agency may not rely on post hoc bases after the agency has promulgated a rule. Columbus & Southern Ohio Elec. Co. v. Costle, 638 F.2d 910, 911-12 (6th Cir.1980). In this case, Nationwide was not the agency deci-sionmaker — the AU was. Therefore, the AU was -entitled to examine any and all evidence in the record. The AU fully documented his decision at the time he made it.
The district court did not err in considering the May 1987 analysis.[3]
D.
Queen City argues that substantial evidence does not support the conclusion that the standard fee screens resulted in an inherently unreasonable price for seat lifts.
This issue involves the first of the two steps of an IRA determination; determining whether the charge produced by the standard fee screens is inherently unreasonable. If the standard fee screens produce an excessive charge, the second step is determining the IRA amount. Although the two steps are separate, the information used in both determinations is often the same. In other words, the information demonstrating that the standard fee screens produce excessive charges is often the same information indicating what a proper IRA should be.
We briefly recount the most relevant data submitted to the AU relating to the seat lift chair market in 1986-87.
—For the fee screen year 1987, the base year is July 1985-June 1986. During this time, in the Ohio/West Virginia market, 16 seat lift suppliers submitted a total of 1,937 reimbursement claims. Of these, Queen City submitted 1,818, or approximately 94%.
—During July 1985-June 1986 base year, utilization of the prevailing charge fee screen and the customary charge fee screen produced charge levels of $1,795.
—The 1986/87 Sears catalog listed the price of a basic seat lift chair as $799.95. When delivery, tax, and assembly labor *245 costs are added to this figure, a price of $891.95 is reached.
—The Secretary points to the following data as illustrating that the Sears-based price is reasonable. A survey of suggested retail charges revealed that five of eight suppliers - charged prices less than $891.95, and a survey of wholesale costs of seat lift chairs revealed that the average wholesale cost was less than $500. A survey of six other Part B regions revealed that all six had seat lift allowances that were less than $891.75.
—Queen City advances one piece of contradictory evidence, an affidavit from a seat lift manufacturer stating that its retail price for a chair comparable to the ■basic Sears chair was $1,395.
The relevant regulation governing the determination of whether a charge is reasonable provided:
HCFA or a carrier may make a determination that the standard rules for calculating reasonable charges set forth in this subpart resulted in grossly excessive charges. Examples of the circumstances which may result in grossly excessive charges include, but are not limited to the following:
(A) The marketplace is not competitive.
(B) Medicare is the primary source for payment.
(C) The charges involve the use of new technology for which an extensive charge history does not exist.
(D) The charges do not reflect changing technology, increased facility with that technology, or changes in acquisition or supplier costs.
(E) Prevailing charges in a locality are grossly in excess of prevailing charges in other localities.
(F) Charges are grossly in excess of acquisition or production costs.
42 C.F.R. § 405.502(g)(l)(i) (1986). In this case, the carrier found that the first circumstance existed: a noncompetitive marketplace. ■
Queen City’s submissions on this point greatly confuse the issue. Queen City repeatedly states that Nationwide did not rely on the proper factors when it made its determination. This point is irrelevant. The question before this court is whether substantial evidence supports the agency’s determination. The agency’s determination in this case is the decision of the AU, not the decision of the insurance carrier, Nationwide. The AU had the duty-.to look at all relevant evidence, including evidence that Nationwide did not consider.
Queen City presents several arguments on this issue. We think none is persuasive. First, Queen City argues that Nationwide was required by HCFA regulations to make an explicit determination that the application of the standard fee screens resulted in a grossly excessive charge. The regulations establish no such requirement, nor do the regulations establish that the failure to make the explicit determination prevents the carrier from concluding that the charge is inherently unreasonable.
Second, Queen City argues that Nationwide’s determination that the standard fee screens produced an inherently unreasonable charge is not supported by substantial evidence. Queen City argues that Nationwide misanalyzed the standard fee screens. Queen City notes that Nationwide examined two of the standard fee screens — the customary and prevailing charges — and determined that the lowest figure they produced — $1,795—was excessive. Queen City argues that the lowest figure that the standard fee screens should have included was the charge produced from the lowest cost level (LCL) fee screen.[4] This method assertedly produced ■ a figure of $1,249. The AU agreed with Queen City that the *246 LCL method produced the lowest of the standard fee screens, that figure being $1,249, but found that $1,249 was still excessive.
After reviewing the record, we think the AU erred when he concluded that $1,249 was the appropriate lowest figure. The HCFA permits a carrier to utilize the LCL method only after the Secretary has designated a certain item as subject to LCL criterion. The Secretary did not designate seat lift chairs as LCL items until April 1987, months after the calculation of the 1987 IRA. 52 Fed.Reg. 12,969, 12,977 at § IV.A.59 (1987).
Even assuming that the $1,249 figure was the lowest figure produced by the standard fee screens, substantial evidence supports the conclusion that it was inherently unreasonable. The amount $1,249 is still a product of a market dominated by Quéen City, and is still 40% above the Sears catalog price.
Third, Queen City argues that substantial evidence does not support the AU’s conclusion that the market in question— Ohio/West Virginia — is not competitive. The record disproves this contention. During the relevant base year, 1985-86, Queen City supplied 94% of the seat lift chairs in the area for which Nationwide was the carrier. This is clear market dominance. One circumstance that may result in a grossly excessive charge includes a marketplace that is not competitive. 42 C.F.R. § 405.502(g)(1)(i)(A) (1986). The relevant market here is Ohio/West Virginia. This court held in ASLM that similar figures in the preceding case created a situation where “Queen City Home Health Care dominated three-fourths of the pertinent seat lift market____” ASLM, 858 F.2d at 312 (emphasis added). The regulations direct carriers to examine the standard fee screens in a specific locality, 42 C.F.R. § 405.505 (1991), or, failing that, in the carrier’s region. Nationwide examined Queen City’s dominance of the market in which Nationwide gathered its data for the prevailing charge and customary charge fee screens. The combined Ohio and West Virginia market was the proper market for the AU to analyze. The AU’s conclusion that Queen City’s submitted charges were excessive due to market dominance is supported by substantial evidence.
Queen City also argues that Nationwide failed to investigate the prices charged by other suppliers in the market. This point is irrelevant to whether substantial evidence supported the AU’s conclusion that the standard fee screens produced an excessive charge.
Fourth, Queen City argues that Nationwide’s failure to develop any information about actual price markups should preclude inclusion of wholesale cost information in the determination of substantial evidence. Cuppy, the Nationwide audit manager, testified that his experience in the durable medical equipment market indicated that a markup of 66-%% was reasonable, and that he applied this figure to the average wholesale cost of seat lift chairs to confirm his decision. In isolation, this would not be a decisive factor, but it does contribute to the evidence in support of the IRA determination. Further, Queen City has presented no evidence regarding an average price markup in the seat lift chair market, thus leaving the AU, the district court, and this court with no countervailing evidence with which to do a comparison.
Fifth, Queen City argues that the use of non-Medicare prices is not substantial evidence. More specifically, Queen City disputes reliance on the suggested retail prices from seat lift chair manufacturers. Reliance on such prices was proper. Until March 1987, the Carrier’s Manual specifically listed suggested retail prices as a factor. After March 1987, the manual did not specifically mention suggested retail prices, but did allow carriers to consider “[ojther relevant factors.” Suggested retail prices are certainly relevant to a cost determination.
Finally, Queen City disputes the results of the telephone survey conducted by Nationwide as part of its May 1987 analysis. Although there are minor discrepancies in the data, on the whole the survey contributes to the substantial evidence supporting the AU’s decision.
*247 We hold that the ALJ’s decision that the standard fee screens resulted in an unreasonable charge is supported by substantial evidence.
E.
Queen City argues that the AU’s decision to base the 1987 IRA on the Sears catalog amount is not supported by substantial evidence because 1) relying on a catalog price from a non-Medicare supplier to determine the IRA for a Medicare supplier is inappropriate, and 2) the Sears price chosen is not a realistic price even for Sears.
The regulations governing the determination of an IRA state:
In establishing a limit, HCFA or a carrier considers the available information that is relevant to the category of service and establishes a reasonable charge that is realistic and equitable. The factors to be considered in establishing a specific dollar amount or special method may include the following:
(i) Price markup. This is the relationship between the retail and wholesale prices or manufacturer’s costs of a category of service. If information on a particular category of service is not available, HCFA or a carrier may consider the markup on similar services and information on general industry pricing trends.
(ii) Differences in charges. HCFA or a carrier may consider the differences in charges to non-Medicare and Medicare patients or to institutions and other large volume purchasers.
(iii) Costs. HCFA or a carrier may consider resources (overhead, time, acquisition costs, production costs, complexity, etc.) required to produce a service or product.
(iv) Utilization. HCFA or a carrier may impute a reasonable rate of use for a category of service and consider unit costs based on, efficient utilization.
(v) Charges in other localities.
(vi) Other relevant factors.
42 C.F.R. § 405.502(g)(2) (1991).
Before analyzing the determination of the 1987 IRA amount, we pause to note that participation in the Medicare program is voluntary. If a supplier is not satisfied with the IRA a carrier has chosen to apply, that supplier may choose not to act as a Medicare supplier. As to Medicare in general, this court has held:
We begin by noting that participation in the Medicare program is a voluntary undertaking. Providers of health care who choose to participate in the federally sponsored program for the aged and disabled do so with no guarantee of solvency. Just as those who choose to serve individuals not covered by Medicare assume the risks of the private market, those who opt to participate in Medicare are not assured of revenues. As is evident here, participation in Medicare involves a degree of risk which increases directly with the percentage of patient services paid for with government funds; the economic rule which instructs that diversification decreases risk does not stop working just because the government becomes involved.
Livingston Care Center, Inc. v. United States, 934 F.2d 719, 720-21 (6th Cir.) (citations omitted), cert. denied, 112 S.Ct. 636 (1991). This court applies the same rationale to Part B reimbursements.
In this case, Nationwide informed Queen City of the 1987 IRA in December 1986. At that time, Queen City had the option to choose not to supply any seat lift' chairs in 1987, thereby eliminating the risk that it might not be able to make a sufficient profit from that business. Instead, Queen City chose to supply chairs and hoped that its appeal of the 1987 IRA would succeed. This choice involved a risk of financial losses on seat lift chair sales; but the choice was Queen City’s.
Queen City generally contends that the 1987 IRA was set using a single factor— the Sears price. While this may apply to the initial determination in December 1986, neither the AU nor this court is prevented from examining evidence produced after *248 that decision. Therefore, we may consider the information previously described relating to wholesale prices and charges from other localities.
Queen City argues that Nationwide failed to. look at factors other than the Sears price. According to Queen City, under the regulations and the Carriers’ Manual, “a carrier must consider several factors such as price markup, differences in prices between Medicare and non-Medicare markets, acquisition or production costs, etc., in calculating the amount of an IRA.” This statement misconstrues both the regulations and the Carriers’ Manual because neither require a carrier to consider all of the listed factors; rather, as stated in the Carriers’ Manual: “You [i.e., carriers] may use whatever factors are available____ Some of the factors that might be considered include, but are not limited to____” Section 5246 (emphasis added). Furthermore, given that this court is reviewing the AU's decision, the fact that Nationwide initially relied only on the Sears price is irrelevant.
Queen City also argues that the Sears price does not constitute substantial evidence because it does not reflect costs incurred by Queen City in excess of the costs incurred by Sears. Most notably, Sears does not incur the costs processing the claim through the Medicare Part B program. This argument is not persuasive. Queen City fails to cite any case, regulation, or manual provision requiring the agency or carriers to consider marketing and selling costs; while the carrier or agency may do so, it need not.
The regulations allow consideration of other factors, which in this case constitute substantial evidence to support the AU as to the amount of the 1987 IRA. Those factors include: 1) price markup data, derived by comparing the average wholesale cost (from phone survey) with the proposed IRA; 2) charges in other localities; and 3) manufacturers’ suggested retail prices (from phone survey).
Finally, Queen City argues that the Sears price is not realistic even for Sears, reasoning that the model from which the price was taken, Sears’ least expensive seat lift chair, is loss leader for Sears. Therefore, not even Sears considered the $799.95 price realistic. This court finds no evidence in the record to support this assertion. The record indicates that Sears sold 96 of its least expensive models in 1987, accounting for 31% of its total sales. Queen City’s argument assumes that Sears actually lost money on each sale, an assumption that is unsupported by the record.
In summary, the AU’s determination as to the amount of the 1987 IRA is supported by substantial evidence.
III.
In conclusion, we hold that while Nationwide may not have complied fully with provisions in the regulations and in the Carriers’ Manual governing the procedure for determining the IRA, this court does not review Nationwide’s actions. The decision under review is the decision of the AU, and there is substantial evidence to support it.
The district court’s judgment is AFFIRMED.

. The amended § 405.502(a) reads as follows (added language emphasized):
The criteria for determining what charges are reasonable include:
(7) Other factors that may be found necessary and appropriate with respect to a category of service to use in judging whether the charge is inherently reasonable. This includes special reasonable charge limits (which may be either upper or lower limits) established by HCFA or a carrier if it determines that the standard rules for calculating reasonable charges set forth in this subpart result in grossly deficient or excessive charges. The determination of these limits is described in paragraph (g) of this section.
42 C.F.R. § 405.502(a) (1986). The court quotes the language of the new paragraph, § 405.-502(g), later in this opinion.
In 1988, the Secretary amended this regulation again, redesignating some sections and adding provisions not relevant to this case. See 53 Fed.Reg. 26067-73 (1988); 42 C.F.R. § 405.-502(g) (1991). This opinion will cite to the current version of the regulation unless it differs from the versión in effect in 1986, in which case we will cite the 1986 version.

. The district court held that "the IRA for lift chairs was established prior to the August, 1986 amendments [to the regulations].” This court disagrees and concludes that the 1987 IRA was in fact established in December 1986. Nevertheless, our disagreement with the district court on this point does not change our determination that the district court reached the correct result.

. In Queen City’s Reply Brief, it essentially concedes this point, noting:
Assuming, arguendo, that the Secretary is correct and the decision on appeal is the decision of the AU two and one-half years after the challenged 1987 IRA became effective, the only legal consequence for this appeal would be to defeat Queen City’s arguments that the May Memorandum was an inadmissible post hoc rationalization.

. The lowest charge level is a fee screen established by both the statute and the regulation. Under this method, the carrier reviews the charges submitted to it for an item from all suppliers during a three-month period (the three months immediately after the base year), and determines a charge level that would be higher than 25% of all the charges submitted during that three-month period. That level becomes the LCL. 42 C.F.R. § 405.51 l(c)(2)(ii) (.1991). An important condition to the application of the LCL method is the published designation by the Secretary of the item as subject to the LCL fee screen. 42 C.F.R. § 405.511(b) (1991).